Good morning, Your Honor. May it please the Court, Paul Hoffman for the appellants in this case. I'd like to start, and I'd like to reserve three minutes for rebuttal, if possible. I'd like to start with the negligence issue, because I think it's actually the easiest one. The Court made a number of errors. First, it seems like he said that there were no allegations of pre-shooting conduct, but there are plenty of them. Well, the transcript actually goes on at some length about that, that the pre-shooting conduct was intended to be part of the negligence action. But it is sort of in a part of the transcript that's just talking about negligence, not about the 1983 claim. So which is it? Well, it's about the negligence claim. We understand that under Billington, pre-shooting negligence is not part of our claim for the 14th Amendment. That's not what Billington says. Is that what your claim is? No. The reason I started with negligence is that under Hayes, which of course the District Court didn't have before it, it's clear now, if it wasn't clear before, that pre-shooting negligence is sufficient for a negligence claim. And in fact, our complaint has allegations of pre-shooting negligence in it that were incorporated by reference in paragraph 44. Well, I guess it's hard to parse everything out. But what, for me, what it ultimately comes down to, and I went through everything, how can someone, because what ultimately happens is you have a nude woman with a shotgun at the door, and when someone's pointing a shotgun, moving it around, why doesn't someone have a right to shoot back, whether it's an officer or someone else? Well, if I can break it in two parts, one of the reasons I started with negligence is that under the Hayes case, if the officers put themselves negligently in a position for that to happen, which is what our claim is, that alone could be negligence, even if under the Federal standard it would be an objectively unreasonable shooting. But I guess, how do you, okay, what they did was they get together, they, there's information that a census worker has been there, that the census worker mentions the guns so that they know the guns are in the residence, they decide to do a knock and talk, which is the least intrusive of anything that you can possibly do. The first person that comes out with a gun, they don't shoot that person. They take, they remove that. So it's not, you know, I mean, you can't claim that they're trigger happy because someone else came out with a gun first and they get him out of the way, and then you got a nude person, then after that you got a nude person with a gun waving a shotgun back and forth. You can talk about all these other things, but that's the elephant in the room. Well, let me, I mean, let me go through that, because in addition to the negligence claim, which I think we can establish, at least there are genuine issues of material fact about whether they should have done what they did, going there at night in dark uniforms, and all the rest. And that even if they had a right to shoot her under the Fourth or Fourteenth Amendment, they still could be liable for negligence. And the district court used the wrong standard that's clear under Hayes. He used the Fourth Amendment standard. The California Supreme Court has said that is not our standard. They said it's a completely different standard. So counsel, to get back to Judge Callahan's question, your case gets a lot harder. If the time sequence, the relevant time sequence starts when folks approach the porch, because she came out of the house with a gun, and it was dark, and that's very, very difficult. But where you started your argument, I want to make sure that we understand this correctly. And the transcript, I think, makes pretty clear that your client's intention was that the sequence, your theory of the case, is the sequence event doesn't start there. It starts back at the fire station where folks are making a plan and approaching the house in the way they did. And you think pre-shooting conduct is relevant for your negligence claim, yes? Well, yes. No, I mean, Hayes says it is. Well, Hayes is the law. I'm trying to figure out your theory of your case. Oh, yeah. What we're saying — And the trial court judge had — counsel, if you could just let me finish, that would be really helpful. Sorry. The trial court judge had significant difficulty with this and didn't see that claim in your complaint, and you or whoever was representing the plaintiffs offered to amend. But in fact — Is that correct? Well, that's what the judge said, but he's wrong. And my understanding is that the opposing counsel at the time stood up and said that the city had perceived through discovery that that was indeed one of the theories of your case. Well, right. I mean, in addition to that, the judge was wrong. There are pre-shooting negligence allegations. I've read the complaint. So did you try to amend the complaint? Well, the case was dismissed after that. The judge didn't allow it. The answer is no. You didn't have an opportunity to amend? Well, we didn't. I'm not trying to be hostile. I'm trying to get the record clear. No. I mean, the judge immediately ruled against us and threw the case out. The answer to my question is — No. I mean, we didn't make a motion after that to amend the complaint. Okay. So if you could then go over to your attorney in your 1983 case, that would be helpful to me, because the transcript doesn't make that part clear. For that claim, your 1983 claim, what is the sequence of events that you think is relevant? What's your theory under 1983? Well, first of all, you'd have to decide which is the standard. But assuming that the purpose-to-harm standard is the standard, what our theory of the case is, is that this was a particularly outrageous conduct by the officers for the following reasons. They were investigating the possibility of a misdemeanor. There was a report about a misdemeanor. Brandishing is a misdemeanor, not a felony under California law. They spent a significant amount of time thinking about what to do. They came to the office, all five of the people on the shift. They came in dark uniforms. They came at 10 o'clock at night. They went to a house that had no lights on, where one would assume — a reasonable officer would assume that people are sleeping. And, in fact, there is a testimony in the record that Mr. Patterson told the officers on the scene, particularly Krauss, that Ms. Vaseline was, in fact, sort of sleeping when she was coming out, before she came out. They hide behind pillars. Three of them are behind pillars. In fact — Okay. So I'm going to — your time is ticking away. So what you're telling me, I think very forcefully, is that for the 1983 claim, you perceive the pre-shooting conduct to be relevant and part of a sequence of events. Is that right? Well, it's part of the total — it's the part of the totality of the circumstances. Yes? Yes. No, I mean, I think that you look at the whole totality of the circumstances. So if that's the case, then why is the standard not deliberate indifference? Well, that's what we — that's what we argued, that it was deliberate indifference. So as you know, I mean, I'm not trying to make this difficult. It's just that the trial court judge thought otherwise and thought you had made the concession that that's not the correct standard. Would you like to respond to that? Yes. No, we didn't concede it. We just didn't concede it. I mean, we said we could meet either standard. That's what we said. That's what the brief said. And then at argument, you argued it, too, right? Yeah. And the judge allowed us to argue deliberate indifference. We laid out deliberate indifference fact. And the judge says, I disagree with you. I think it's purpose to harm. And so we dealt with it as a purpose to harm case. You also argued that there was an evidentiary ruling that was erroneous about Mr. Patterson's statement. Right. But it seemed to me that even if you — even if we agree with you on that, that when the judge made his ruling, he actually assumed that the officers had not announced their presence. Is that right? Had not identified themselves, I should say. It's a little — it's a little bit unclear from the record exactly what the judge did on that. And he — I think. I mean, in reading the record — But that's what he said. Well — So are you saying that he made that up? Well, the district judge — and one of the problems that we have with what the district judge did is that he credited testimony by the officers. I mean, he really seemed to look at things from the officers' perspective rather than in the lights most favorable to the plaintiff's testimony. Well, do we have to disbelieve Judge Mendez that he assumed that to be true when he made his decision? Well, if that's clear to you, then it's clear. Well, that's what he said. That's what he said. Then it's undisputed that they didn't identify themselves. Does it matter, though, since we're on de novo review anyway? I mean, don't we have to figure out what the right answer is regardless of what the judge did? No, I don't think it does matter. And, in fact, I mean, there's testimony. I think if you agree with us on paragraph 14, which I think you should, because Mr. Patterson is standing on the porch. Everybody says he's standing on the porch. The diagrams show him standing on the porch. He obviously could have heard if someone announced themselves as police officers when Ms. Vaseline came out. And the point, I guess, I was getting to in the recitation of moving up to this is that you have a 67-year-old woman in her own home at 10 o'clock at night who hears a commotion, who doesn't know who it is, who doesn't hear police, who doesn't see police. We don't know that. We don't know if she heard police or not, Counsel. But what if I were standing on the porch? I'm not an officer. What if I were standing there and she pointed a gun at me? Can I shoot her? I don't think she was pointing. I think the evidence in the light most favorable to us is that she was never pointing the gun at anybody. Well, it's waving it back and forth. She has a shotgun. According to the ‑‑ she's at the threshold of her house. She has one hand on the shotgun here, one hand there. Nobody said she's got her finger on the trigger. She can't really see ‑‑ the inference is that she can't see people because Officers Wolf and Santana and Williams are behind this big pillar. And there's pictures of the pillar. Was the porch light on? No. And the police cars were parked along the side of the house? There's no evidence that anyone could see the police cars. So is the answer to my question yes? The police cars were parked along the side of the house. They're not in front of the house. I don't see them. I don't really know the answer to that, Your Honor. That's what the record says. The record says that pretty clearly. Right? The record says that. And so what she could have seen, I think it's reasonable, is there's one officer who was on the porch, right, with her flashlight. She was in uniform, yes? No. She was not in uniform? Well, no. She's not on the porch. Well, she was until she tripped. She walked up to the door and knocked on the door, Counsel. First with her hand and then with the flashlight. She was on the porch. But she's not there when Ms. Vaseline comes out. Well, so what did Ms. Vaseline see? In other words, Mr. Patterson comes out first. What she says is that she sees a gun. Well, now she is the officer. She is Alestra, Catherine Alestra, the first one. Yes. And that she trips and then she tries to get out to the side of the house, way away from the porch. Mr. Patterson declares that there's no officer on the porch when he's out there at all. And so when Ms. Vaseline comes out a few seconds later, Santana and Williams are on the left pillar, the right looking this way, very thick pillar. But aren't the pillars part of the porch? Yeah. So when you say there are no officers on the porch, Counsel, that's how I'm reading the record and they're on the porch. I'm not sure if you're standing in back of the pillar that you're on the porch. Okay. I'm not trying to split hairs. I'm just trying to get the scene. All right. The pillars are here. The porch is in back of the pillars. And the officers, I'm not clear if they're down off it or in the back, because I'm not sure the porch goes beyond the pillar. I don't think it does, actually. But they're clear. And they say themselves they're concealed. I mean, they are taking cover. They don't want to be seen. In fact, Santana says. We read the record. We read the record. Yeah. And so when she's looking out, there's no light on anywhere. There's nobody in uniform. And they have black uniforms on anyway. There are guns pointing at her. She can't see over to this side where officers crouch. I think that's an interesting point because it did strike me that you're trying to have it both ways, to say that the officers' uniforms were dark and you can't see the officers, but she can see guns pointing at her. So it sounds to me like Patterson could see some of that. Maybe she can't see guns. I mean, she's looking out into the darkness. And she doesn't know who's there. And then she has a lot of people yelling at her, drop the gun. And the evidence is they don't say they're police officers. They say drop the gun. And what Mr. Patterson says is he says they said drop the gun two or three times and then they shot her. And she wasn't advancing. She wasn't aiming. I mean, on the objective evidence light and the light most favorable to us, she's standing there and moving the gun a little bit. Well, there was evidence that she was coming forward. Maybe a step. That's it. But the evidence also is where the X marks on the diagram, she's killed on her doorstep. She's not advancing in the sense of the cases. But, counsel, the evidence is that she had taken that step, and the evidence is that she had the gun at least at sort of waist height and it was in the direction the witnesses said that it was pointed at best at their legs as opposed to, you know, at their chest or heads. But it's a pretty tenuous situation. But I think the question is from our standpoint, and obviously the clerk can disagree, is that we think it's for the 14th Amendment that if it's a purpose to harm standard, they created the situation, the officers. They didn't respond to something they didn't create, and they killed a 67-year-old woman who didn't shoot at them, who basically was told by a cacophony of voices, drop the gun, and then she was blown away. Within seconds. Why couldn't they have position of cover? Why don't they make sure that she knows there's a police officer? Why don't they give her a chance more than a few seconds? Is it the case that a 67-year-old woman coming out of sleep has a split-second decision to make or she dies? Can I take you back to something earlier? So I think you have trouble with your 14th Amendment claim. But after Hayes, my colleagues might not agree, but I think you probably have a negligence claim, but I'm concerned about this exchange you had earlier with Judge Kristin about whether you actually preserved the negligence claim. Can you talk a little bit more about that and how it's in the complaint and your response to her question again? There is — there are allegations of pre-shooting negligence in paragraph 16-21 about bad tactics, about the way they came up. The case was litigated that way. All the depositions in the record are about all the things that happened leading up. And even under the 14th Amendment standard, the totality of the circumstances test requires you to look at all these things. And so no one was surprised by that. And the Fourth Cause of Action incorporates, by reference, the first 25 paragraphs of the complaint that have all those things. And so they had it. They litigated the case that way. And after Hayes and the judge didn't know whether there was pre-shooting conduct because he said it was up in the air, Hayes resolves that. And Hayes also says that what the judge did in terms of his manner of even considering the negligence claim that he did consider was wrong because he used the Fourth Amendment. And Hayes says it's not the Fourth Amendment. It's broader than that. And I'm not sure how else he would – I mean, I think the judge was just mistaken about the fact that there were those allegations and that we basically made a claim under the way that Hayes says you make a claim for this. And it also says that the duties owed to the – Hayes says the duties owed to the children. It was exactly the same kind of case, the 14th Amendment case. So there's no issue about that, although that's not even raised, I think. But there isn't an issue about that. And Hayes really shows that we have that claim. All right, Mr. Hoffman, you're a minute over. I will give you two minutes. Thank you very much, Your Honor. That's two extra minutes. Okay. Mr. Whiteside? Good morning. I'm John Whitesides for the defendants in Appalese, City of Yuba City, Officer Krauss and Officer Santana. I want to start by commenting on the issue that you ended on with opposing counsel, which is what was procedurally the case in the district court with respect to the claims that are being appealed. On the negligence claim, the sole allegation, which is at page 46 of – or, excuse me, paragraph 46 of the complaint, and that's at ER 155, defendant police officers breach their reasonable duty of care toward plaintiffs and decedent by unlawfully shooting and killing decedent. That's the only allegation. But the allegations in the complaint started way back, right? It started with when they started the planning. It explained that it was dark and went to the – you know, they went to the porch. All of that is also in the case. So don't we need to read the complaint as a whole? You do. But in terms of notice to the defendants, it's true that everything's incorporated by reference. That's true for the venue allegations, the jurisdictional allegations, the who – But, Mr. White, at the district court, the defendants admitted during the district court summary judgment hearing that they knew the officers' pre-shooting meeting and tactics were at issue in the case. I don't think that's quite exactly what Mr. Kilday said at the hearing. I think what Mr. Kilday said is we knew that they were inquiring into these. We weren't aware that they were going to be asserted as a basis for liability. Counsel, I certainly read that transcript the way Judge Callahan reads it. And even if we are mistaken or reading, you know, too generously into that transcript, why wouldn't it – if the defendants were aware of that through discovery, why wouldn't it have been appropriate to allow amendment? Nobody was surprised. No one asked for leave to amend. Well, you know the case law in this. Is it your position that they would have had to ask for leave to amend? The plaintiffs? Yes. Certainly. Why not? Isn't the court supposed to give leave to amend if it's possible that a claim could be stated? Without it being requested? I mean, I actually read the transcript as they basically did request it. In the hearing, when they start to say, well, was this really in the complaint, they say, well, we could amend, right? No. I think their argument was there's been no prejudice. They didn't say we need to – we want to amend. Their argument was it doesn't matter, there's been no prejudice. He said we could amend the complaint. Well. He said to the judge we could amend the complaint. Yeah. And I think at that point, the judge is saying, but the motion is directed against the pleadings as they were at the time. And we didn't have an obligation to defeat unpled allegations. So at that point, you'd have to start all over again, and you would have prejudice, right? Because now we have to do the whole process all over again. Well, now you're anticipating a motion that was never argued. That's true. There was no argument on that motion. Well, let's go to the substance then. Let's assume that amendment should have occurred or that one could read the complaint in such a way that pre-shooting negligence was fairly at issue. Hayes says that pre-shooting negligence matters only if it's an independent cause of harm. There's no such contention here. There's no contention that any harm befell Ms. Vaseline prior to being shot. Or, like in the Groot case, if a shooting that appears reasonable viewed just under the immediate circumstances would look unreasonable given a fuller context, and Groot's the perfect example, because at the time he's fleeing, he looks like he's going to pose a danger to other people when he's shot. But then if you go back in time, you see, well, he's fleeing because a plainclothes officer walked up and tapped on the window with a shotgun. It's why I said to opposing counsel his case gets a whole lot harder if the time sequence is telescoped to what happened on the porch. Right. Right. What breach of the duty of care do we have prior to Mr. Patterson's appearance at the door with the gun? What duty of care was breached? Aren't they arguing that they were negligent in coming in dark uniforms, in the dark, not illuminating the porch, not making a plan to wait until the next day? You know, if it was such a serious incident, why didn't they wait until the next day and get a warrant? I mean, they're arguing that this was negligent police conduct. And isn't that a jury question, whether it is? No, because duty is a question of law. There are no such duties. There is no legal duty to wear a light-colored uniform. There's no legal duty not to take a position of concealment or cover when approaching a potentially dangerous suspect. There's no duty to call ahead of time rather than knocking on the door. They don't have any authority that establishes a duty for any of the things that they're alleged. But under general negligence theory, he's arguing that they didn't use due care, that there was a much safer way to do this. But you still have to have a duty. But doesn't Grutt – I mean, why doesn't Grutt tell us that there is a duty not to come and put, you know, an unidentifiable uniform, create a dangerous, scary situation? I mean, you can break it down and say we don't have case law in each particular duty, but the general idea that the police shouldn't create a situation that is so scary and dangerous and not understandable that someone might react in a dangerous way, I mean, that is a duty that we see in the case law. How did they create a dangerous situation? I oppose the other side of it, because I think I'm hearing what – but to her question, I'm saying that, okay, so wouldn't that be telling the police how to do their job from the standpoint that you can't go at night and knock on someone's door and ask why they pulled a gun on a census worker that night? Exactly. I mean, how did they provoke danger? They protected themselves in a way that posed no harm to anyone else by being in cover. And they knock on the door. Counsel, it's not really very helpful for you to pose questions to us. No, no, no. I'm not – I'm not expecting you to answer, Judge Kristin. Well, that's good. What I'm saying is rhetorically, they didn't do anything to heighten the danger that already existed. So your brief makes that screamingly clear. You repeated that. But what would be helpful to me, just speaking for myself, is if you could respond to his arguments. His arguments are that the actions taken by the police exacerbated the situation and made it a whole lot more likely that she was going to get shot. Because once she comes out – and they had earlier noticed that she had a gun and that she was intoxicated. So a very dangerous situation. And that once they approached in the way they did – I won't tick off all the factors Judge Friedland just mentioned – that once they approached that way, they made it much more likely that they were going to be in the situation where they went out to shoot her. That's his argument. So can you respond to that? Are you talking about after Patterson comes to the door or before? He's talking about the whole ball of wax. The whole ball of wax. There's no exacerbation of danger by anything that they do before Patterson comes to the door. All Lester does is knock on the door. She sees the gun. She immediately tries to evade the threat. Okay. So could I stop you there? Forgive me, but your time's ticking. What he would say is that it's not – you're starting the time frame much too close to the shooting so that what Officer Lester did for starters is have a meeting and decide to approach at night. It was going to be 10 o'clock at night by the time they got there. The scene wasn't lit up. They didn't use a bullhorn or call or otherwise announce their identification, all of those steps. That's what they're arguing. Right. All she did, that is not plaintiff's theory of the case. And why isn't that a question of fact for the jury, whether the police conduct in this case really made the situation much more likely to result in this tragedy? Because none of that is unreasonable. For them to request backup, to take positions of cover, this is not a misdemeanor. I completely disagree. When did the census worker come to the house? I'm sorry. What time was it when the census worker came? We don't know exactly what time, but we know that it was roughly a couple of hours prior to the officers arriving there, just from going backwards. So the census worker arrived in the dark also? No. This was in late May. It would be light out until 8.30, quarter to 9 o'clock. So is that a problem for you? Because that's clearly an ‑‑ it's sort of unstated, but that a lot of time had gone by. Not that it's ‑‑ not to minimize the danger of this intoxicated person pointing a gun at a census worker, but that a lot of time had gone by, and so this wasn't a real exigent circumstance. Is that a problem for the city? I believe it was an exigent circumstance in the sense that you have assault with a deadly weapon being reported. Well, what they say is that you had it several hours ago. Right. Well, they have to go meet with the victim first to get her side of the story. And as soon as they do that, then they immediately go to the house. They stop and talk first on she wants backup, so she gets the backup, and then here's what we're going to do. And as Judge Gallagher said, they picked the least intrusive means possible. Let's hear her side of the story. Why didn't they get an arrest warrant? They didn't need an arrest warrant. They already had probable cause. I mean, they didn't get any kind of warrant, though. They could have, right? Well, they didn't need a warrant just to ask questions. Aren't they going to have an expert? If they would have gotten an arrest warrant, that essentially means that they think that she did it, and they want to hear her side of the story, right? Well, they wanted to hear her side of the story first. Before they make a decision on whether she should be charged. Right. And maybe do a field lineup. Maybe have the victim come down and say, yes, this is the woman, and maybe try to get a search warrant for the gun. But she was just taking it one step at a time. So I guess in order for negligence, for there to be a tribal issue on negligence, what Appellant is saying, there were different ways the police could have done it. There are always different ways in hindsight that the police could do their work. So what would, in your view, what would he have had to have shown to survive summary judgment on negligence here? He would have had to show that they provoked the violent response. For example, like in this Court's cases, in Espinoza, and the other one just went right in my head. But those were cases where the officers enter the dwelling without a warrant, encounter the suspect in the suspect's home, and then the deadly force is used. And this Court has said, well, that was provoked by the prior constitutional violation of the illegal entry to the home. So if the officers did something here, obviously on the Fourteenth Amendment it would have to be unconstitutional. But on the state law side, if they did something unreasonable like in Groot, where you walk up to the car in plain clothes and tap on the window with a shotgun, then it's reasonable someone might try to flee. Here, it's not reasonable for someone to come out with a gun just because the officer knocks on the door. Well, what they're going to say, what they said in the brief is that it was  earlier with a gun, and they say it was in a scary neighborhood. And she wouldn't have been able to see that there was police officers out there. It would be helpful for me to know what the city's response is. None of that is admissible. There's no admissible evidence as to what she thought or feared. But we have Mr. Patterson. That evidence was stricken by the district court. They have a pretty strong argument that it was improperly stricken. No, no, no. They didn't challenge that part of the evidence. You're talking about the spatial proximity. The evidence as to what Mr. Patterson heard or thought Ms. Vaseline was afraid of, they conceded that that was inadmissible. But the idea that it was a dangerous neighborhood, that the porch wasn't lit, that it was dark. There's no evidence of that. There's no evidence. Well, no one is saying the porch was lit. No, no, not that the porch was lit. There's no evidence that it was a dangerous neighborhood. There's no evidence in the record of that. The porch being unlit, yes, that's correct. Everyone agrees the porch wasn't lit. Are you sure about that, counsel, the last statement you just made? Yes. I thought Vaseline said that it was a dangerous neighborhood. No, no. That's the evidence that was stricken. The evidence that was stricken was Patterson's declaration about what Vaseline was afraid of. Right. But Patterson. So I understood counsel to have conceded that Patterson couldn't talk about what was in Vaseline's mind. Correct. But the fact that it's a dangerous neighborhood is a fact in itself, not just what's in her mind. Correct. But Patterson's declaration says nothing about the neighborhood being dangerous. There's two different statements, and I think this is what you were getting at earlier. I hope it was. One of which was stricken and one of which wasn't. Patterson had two statements about whether they announced their presence. And one had to do with what he heard at the time of the knocking on the door, and the other had to do with what he, which wasn't stricken. He said that he couldn't, he didn't hear her say Yuba City Police. Right. And then the other statement, just to be clear, is the statement that was stricken because the judge felt that there wasn't adequate foundation, what was said after Patterson was outside. Correct. There is a pleading issue in that regard, too, Judge Kristin. The pleading issue is that the complaint alleges that Patterson immediately recognized that they were police before he went outside. That's why he threw his gun down and walked out with his hands up. And then all of a sudden in the opposition, they changed the theory to, oh, no, I didn't know who they were until I got out there, never trying to explain, well, then why did you drop your gun and walk out with your hands up if you didn't know who was out there? So that's a problem, too. It's undisputed that the gentleman that came out did drop his gun and they took him, they removed him, and they didn't shoot him, all right? Correct. How does that factor into your argument that they didn't do anything to provoke this? It shows that their tactics were successful in disarming the first person who they encountered because he complied with their instructions to disarm. Is there any evidence that he'd been drinking? Yes. His blood alcohol level is in the record. It was a .17, I believe. I didn't ask my question clearly. Forgive me. What I mean is at the time the census worker was there several hours earlier and she said that Ms. Vaslin smelled of alcohol. Did she say anything about Mr. Patterson? No, she didn't. So I'm trying to figure out what the police knew when they approached the house. Am I right that they wouldn't have known one way or another whether he had been drinking? You are correct. Thank you for that clarification. I'm out of time. Did anyone have additional questions? No, thank you. All right, thank you. Thank you. All right, you have two minutes. Thank you, Karen. Just very quickly, I think the issue on the negligence is whether the totality of the circumstances, and your honors have made my argument in the questions in terms of what the different issues are, those are jury questions. There's a dispute about whether these officers in their tactics, their execution, and ultimate shooting behaved reasonably. And under California law, that is. Judge Callahan, you asked, do the courts tell officers what to do? Well, under negligence claims in California, they do. I'm questioning, though, when a gun comes into play, it changes everything about what would have been reasonable. I mean, in terms of the . . . when someone points a gun at you, to me, that seems to be discreet from . . . if you knock on the door, and then things . . . from thereafter, people point a gun at you, all the planning in the world, at that point, you're looking at, you know, saving your life. But a jury could find that . . . Unless you're saying the police should just never go to someone's house, they shouldn't do their job, they shouldn't investigate crimes. Not at all. I mean, we're saying they should do it when it's light, perhaps. They should do it if they're not going to do it when it's light. Well, what's your best case to say that you can tell the police how to do their job and investigate a crime? Under California law, California law says that juries in California have the ability to decide whether police tactics, conduct, and ultimate shooting are reasonable in the totality of the circumstances. That's what it says. And it says that . . . counsel started to cite the Ninth Circuit cases. What Hayes says is, forget the Ninth Circuit cases. We don't follow Billington. We don't follow those cases. We don't follow objective reasonableness under the Fourth Amendment cases in the Ninth Circuit. What we say in Groot . . . And they say it's not just a new thing. They say it goes back all the way, that in California, the courts have decided, under negligence law, that the police have to behave reasonably in their tactics, their execution, and ultimate shooting. And, in fact, that if they behave unreasonably in their tactics, their planning, their execution, that even if they would be justified in shooting because there's a gun pointed at them, that if they put themselves in that position negligently, they are still liable for the shooting, unlike the law under the Constitution. Okay. Over again. But if you have a question . . . May I ask one more? Sure. May I just ask one more? The declaration of Mr. Patterson says very clearly, he saw two or three guns pointing at him. He didn't see anyone standing there. He couldn't tell who was holding the guns because of the . . . behind the pillars. So, it does sort of seem to me that you wanted to have this both ways. He couldn't see the police officers, but he can see the guns. Maybe that's all he can see. It's kind of unclear here from this part of the record, but . . . because you're out of time. You're over time. Could you respond to opposing counsel's point about the . . . because I noticed as well, the pleading issue that he just mentioned, and that is the discrepancy between where you started and where you ended? Well, I think what he's referring to is that there's an allegation in the complaint that Mr. Peterson . . . Patterson knew that there were police. Patterson may have seen . . . may have recognized the police earlier than he says in his declaration. That's what he's saying. We've responded to that, and they have a footnote, and we have a footnote back, as is usually the case. And the other thing about it is what Mr. Patterson saw is really not . . . But, Counselor, I don't think you're answering the point. The question is, is there a difference . . . isn't there a difference between the complaint saying that Patterson recognized that those were police officers and then what comes out in a declaration? I think that you can . . . we think that they can be reconciled, but there might be . . . That's what I'm looking. How do you reconcile them? Well, it's a timing question, I think. He does say that he recognizes that they're police officers at some point. I see. And, I mean, he does. I mean, but it's not right away. It's a little bit farther down the line. And he doesn't, for example, turn around and say, or is allowed even to say, you know, Victoria, there's police officers. He's told to keep his hands on his head and face away from the front door and all that. I'll review the record, but I understand your theory, and I'll just . . . I'll review the record. Thank you. Thank you, Your Honor. Thank you both for your argument. This matter stands submitted.
judges: Callahan, Christen, Friedland